# Exhibit 5



1612 K Street, NW, Suite #1100
Washington, DC 20006
(202) 457-0034 | info@whistleblower.org

May 6, 2022

Chief Administrative Law Judge
USDOL-Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, D.C. 20001-8002
 OALJ-Filings@dol.gov
Telephone: (202) 693-7300
Fax: (202) 693-7365

    Re:    Perdue Farm, Inc. /Howell/Case No. 7-4120-21-045

Dear Chief Judge Henley:

    Rudy Howell, through his undersigned counsel, objects to the Secretary's Findings in the above-captioned matter. Those Findings are contained in the April 8, 2022 letter from Mr. Kevin Crain, Assistant Regional Administrator, Occupational Safety and Health Administration, Kansas City Regional Office, to counsel for Rudy Howell.  Mr. Howell received the Findings by electronic mail on April 11, 2022. Therefore, Mr. Howell's objections conveyed in this letter, which are due on or before May 11, 2022, are timely.  Attached as well is Complainant's Restated Complaint.

    Rudy Howell objects to the Findings as follows:

    1.    Mr. Howell objects to the findings that: "[t]he parties are not covered under the FSMA because Respondent is not an entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food, within the meaning of 21 U.S.C. §399d(a) and/or Complainant is not an employee within the meaning of 21 U.S.C. §399d(a)." (Findings, p. 1) and "[t]he evidence showed that Complainant was not an employee within the meaning of 21 U.S.C. §399d (a)."  (Findings, p. 2).  Complainant presented evidence that showed he was an employee, including evidence of the significant control Respondent exercised over him and the chicken raising operations in which Complainant was engaged for Respondent.

    2.    Mr. Howell objects to the finding that "A review of the Darden Factors compared to the evidence showed that Complainant was able to set his own work schedule and employ his own strategies to raise the chickens in his care. Complainant has special skills regarding the raising of chickens, owns the facilities and land where the chickens are raised, and pays the utilities at the farm which Complainant owns. Complainant did not receive a salary, benefits or an hourly wage from Respondent; his earnings were based on lump sum payments according to a

1

competitive contract system and payroll taxes were not removed by Respondent. Complainant was free to hire assistants and would be required by the contract with Respondent to manage any assistants he hired." (Findings, p. 1-2). Complainant objects that the Darden analysis leads to the conclusion that Complainant was an employee. There was ample evidence specifically to the contrary, showing that Perdue determined and supplied the feed, medicine and supplies for the chickens, and that Perdue set the standards for housing and tending to the flocks, including requiring numerous requirements on the structure, outfitting, and maintenance of the chicken facilities. Perdue also supplied the chicks and required Complainant to exclusively house Respondent's chicks. The evidence also showed that Complainant could not set his own schedule, that instead Perdue required various tasks to be performed on each day and required additional tasks to be performed on certain key dates during and in between the flocks' growth cycle. The evidence further showed that other Perdue employees were regularly at the farm overseeing the facility and Complainant's performance.

3.      Mr. Howell objects to the findings "the burden of establishing that Complainant was retaliated against in violation of Section 402 of the FSMA cannot be sustained. Complainant's allegations did not make a prima facie showing." (Findings, p. 2). Complainant notes OSHA did not analyze any allegations nor make any findings as to any of the other elements of an FSMA claim, only making a determination that Complainant was not an employee.

4.      Mr. Howell reserves the right to add additional objections pending the conclusion of discovery and further investigation.

Mr. Howell further requests a hearing regarding his Complaint.

Respectfully submitted,

s/Stephani L. Ayers
for the Government Accountability Project

Counsel for Rudy Howell


cc:

Counsel for Perdue
Clayton E. Bailey
cbailey@baileybrauer.com
Campbell Centre I
8350 N. Central Expy, Suite 650
Dallas, Texas 75206
Tel: (214) 360-7433
Fax: (214) 360-7435

Kevin Crain
Occupational Safety and Health Administration
Kansas City Regional Office
 2300 Main Street, Suite 1010
 Kansas City, Missouri 64108-2447

Assistant Secretary

 the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor.

**UNITED STATES DEPARTMENT OF LABOR**

**OFFICE OF ADMINISTRATIVE LAW JUDGES**

*In the Matter of*

| | |
|---|---|
| **RUDY HOWELL,** | ) |
| *Complainant,* | ) |
| *v.* | ) OSHA Case No. 7-4120-21-045 |
| **PERDUE FARMS, INC.,** | ) |
| *Respondent.* | ) |

## <u>RESTATED COMPLAINT OF RETALIATION</u>

Complainant, Rudy Howell, through his counsel the Government Accountability Project, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d against Respondent Perdue Farms, Inc. Complainant was unlawfully discriminated against by Respondent Perdue Farms, Inc. when Complainant made protected disclosures regarding Perdue's insanitary conditions and threats to food safety.

## I.   <u>INTRODUCTION</u>

1.      This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d by Complainant, Mr. Rudy Howell, against Perdue Farms, Incorporated (hereafter "Respondent" or "Perdue Farms" or "Perdue"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent via letter dated August 18, 2020, in retaliation for activity protected under the above statutes. Complainant first received notice of this retaliatory action on August 20, 2020. This Restated Complaint realleges and alleges food integrity violations and practices by Perdue, including from

2019-2020, in which the company falsely claimed to be meeting various food safety and integrity growing protocols.

2. Complainant decided to make protected disclosures regarding his concerns. After many attempts at internal reporting without resolution, he determined that the Respondent had not designed, deployed or maintained any viable internal or external channels for reporting these deceptive marketing statements or the inhumane practices and collateral practices of Perdue for placing, maintaining and removing those chicken flocks. Complainant regarded any external USDA channels available to growers to not be viable for reporting food integrity concerns not directly related to contamination or adulteration of the raw poultry products marketed to consumers. Complainant was unaware of any dedicated or viable FDA external reporting channels available to poultry growers. Complainant became aware of and resorted to public food integrity reporting channels to NGOs and the media, and thereby indirectly to Congress or other federal authorities.

3. The poultry flocks that are the subject of this complaint at all times remained under the sole ownership and control rights and discretion of the Respondent. Complainant and growers like him were employees under contract, despite the language in those contacts by Perdue disclaiming its legal obligations to said employees.

## II.    JURISDICTION

4.    This Complaint was timely filed within 180 days of notice of the adverse actions complained of herein. OSHA had jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below. OSHA has jurisdiction over Respondent as a covered entity by the Food Safety Modernization Act and over Complainant as an employee of Respondent. However, OSHA

issued a determination letter dated April 8, 2022, received by Complainant on April 11, 2022, finding, incorrectly, that Complainant was not an employee of Respondent.

## A.  **Covered Entities under the Food Safety Modernization Act (FSMA).**

5.      The FSMA's whistleblower provision protects employees of covered entities which are engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importing of food. 21 U.S.C. § 399d(a); 29 C.F.R. § 1987.101(d). The FFDCA defines "food," in part, as "(1) articles used for food or drink in man or other animals ..." and (3) "articles used for components of any such article." 21 U.S.C. § 321(f). "Food" includes live food animals. 21 C.F.R. §§ 1.377, 1.227, 1.276(b)(5)(ii). Under the FFDCA, the term "food" includes both (a) animal feed, *see, e.g.*, *Watts v. Perdue Farms, Inc.*, No. 2017-0017, at 6 (D.O.L. Admin. Rev. Bd. May 28, 2020), -and- (b) live animals intended for human consumption, *see, e.g.*, *Morales Sanchez v. New Fashion Pork, LLC*, No. 2020-0004 (A.L.J. Order Nov. 3, 2020).

## IV. **PARTIES**

6.      Respondent Perdue Farms, Inc. is a U.S. food and agricultural products company headquartered at 31149 Old Ocean City Rd, Salisbury, MD 21804-1806. Perdue Farms, Inc. is one of the nation's largest producers of chicken and turkey. It also produces beef, lamb, and pork products. It operates live productions and processing facilities in about fifteen U.S. states. Perdue Farms slaughters nearly 700 million chickens every year. For the fiscal year closing March 2020, Perdue Farms posted $7.1 billion in revenue.

7.      Respondent Perdue works with a network of farmers and ranchers across the U.S. to create its products. Networks are comprised of cattle ranchers, sheep farmers, hog farmers and poultry farmers who must follow a specific and strict set of farming protocols to raise livestock for the Perdue brands.

8.  Respondent Perdue is a covered entity subject to the provisions of the FSMA. Perdue manufactures, processes, transports, receives, holds, and distributes 'food' within the meaning of 21 U.S.C. § 399d(a). First, the chickens that Perdue holds for use as human food constitute food within the meaning of the FFDCA. Second, Perdue manufactures, receives, and/or holds "articles used for food or drink for" the chicken that it is raising. Respondent supplies Complainant with both chickens and chicken feed. Both the chickens (as an article used for food in man) and the chicken feed (as an article used in food for other animals) that Perdue provides to Howell are considered "food" under the FFDCA.

9.  Howell owns and operates the Robert Miller poultry farm in Fairmont, North Carolina. For over 25 years, Howell was contracted exclusively to Respondent to raise chickens for them pursuant to an "Poultry Producer Agreement." Respondent awarded Howell "Top Producer" several times. Respondent never disciplined Howell, nor audited him for any potential non-compliance or performance issues, prior to his sudden retaliatory termination.

## V. <u>FACTUAL ALLEGATIONS</u>

### A. <u>Complainant's Job, Duties, and Performance</u>

10.  Today more than 90 percent of broiler chickens and most turkeys are raised by farmers under contract to poultry companies such as Perdue. These companies are referred to as "integrators" because of their integrated supply chain. Perdue represents to the farmers that its vertical integration provides unparalleled support to its poultry farmers, including: (1) A flock adviser providing ongoing guidance to help maximize the farmer's flock performance— and income; (2) Dedicated veterinarians for each of the growing regions, backed by Perdue's own animal health lab (3) A Technical Services Department that rivals many research universities and houses Perdue's experts in poultry health and nutrition; (4) Research to support continuous

improvement in animal care. Perdue controls the stages of production through vertical integration including: 1. Breeder operations and contract farms; 2. Hatcheries; 3. Feed ingredient sourcing and feed mills; 4. Grow-out operations, including contract broiler and turkey farms; 5. Technical and veterinary services; 6. Harvesting and processing; 7. Marketing, sales and distribution.

11.     Respondent Perdue exerted an extreme level of control over Howell and his farm operations sufficient to operate as Howell's employer. Pursuant to their contract, Perdue selected and consigned chicks to Howell to raise. The contract granted Perdue the authority to determine the number and breed of chickens Howell raised, the time allowed for processing each flock, and placement for future flocks. The contract required that Howell only use feed, medication, vaccinations, or other supplies provided by or arranged by Perdue. Perdue maintained ownership of the chickens.

12.     In exchange, Howell agreed to accept the consigned chicks, and to feed, water, and care for them until the chicks were removed at Perdue's direction. Howell further agreed to use only the feed, medications, vaccinations, and other supplies Respondent Perdue provided. Respondent required Howell to house and tend the flocks in accordance with Respondent's standards. These standards imposed numerous requirements on the structure, outfitting, and maintenance of Howell's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional specific tasks to be performed on certain key dates during and in between the flocks' cycles.

13.     Respondent assigned Howell a Perdue Flock Supervisor.  Respondent checked in at least weekly and often twice a week on Howell's farm to ensure that Howell was maintaining the facilities and tending to flocks in accordance with Respondent's dictated standards. Perdue's

agreement granted them the right to place Howell on a Performance Improvement Plan if Howell's flocks failed to achieve Perdue's minimum standards of competitiveness.

14.    As of July 2020, Howell reported to Perdue Flock Supervisor Dean Shuttleworth. Flock Supervisor Shuttleworth reported to Perdue's Live Production Manager Lyn Price. Perdue's Live Production Manager Price reported to Perdue's Plant Manager Randy Brown. The Plant Manager reported to Perdue's Director of Live Production Tim Little.

15.    At the end of the chick's growth cycles, or roughly six (6) weeks after placement, Respondent removed the chickens for transport to slaughter and processing facilities owned and operated by Respondent.  Respondent transported chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

16.    At these facilities, Respondent slaughters, processes and packages chickens and turkeys for sale to consumers.  Respondent is one of the largest producers of poultry products in the United States, and it sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.  Respondent also imports, exports, receives and stores grains and other raw and processed agricultural commodities and products, which Respondent processes for use in animal feed and pet food.  Those raw and processed commodities and processed are also subject to FDA regulation apart from the poultry they are used upon.

17.    Perdue compensated Howell per flock based on rankings and ratings assigned in Respondent's "tournament system."  Under this system, which is indistinguishable from a factory worker's performance appraisals or a brokerage employee's bonus/incentive structure which require frequent ongoing ratings, farmers are ranked against one another, and top-ranked farmers can be paid up to 50 percent more than the bottom ranked farmers. The ranking formula

is mainly based on feed efficiency: how much weight the chickens gained, compared to how much feed the company supplied. Respondent reserved the right to pay as much, or as little, for each chicken based on their set standards that were mostly beyond Howell's control.

18.     Howell had little control over the farm's poultry profit margins. Howell could not grow for, nor sell chickens to, any other poultry company because Respondent required Howell to house exclusively Respondent's chicks. Because Respondent delivered the type and number of chicks Howell was to grow, dictated the point of removal in the growth cycle, determined the quality and timing of feed, and determined the pay structure, Howell's profits were largely controlled by the Respondent. Respondent's tournament style rating and pricing system resulted in wide variations in Howell's profits.

19.     Evidenced by their fully integrated monopsony structure, and because Respondent's business is mass production and sale of poultry to the U.S. and international consumer market, Howell's role in raising chickens for Respondent is the most integral part of Respondent's business.

20.     The foregoing facts demonstrate that Complainant was an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e). These foregoing facts also demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

**B.  Background Facts Relevant to Protected Activity**

21.     Since his start with Perdue, Howell has participated in annual trainings and updates for poultry welfare. In recent years, Perdue Flock Supervisors have met with farmers on

their farms to discuss any updates to the poultry welfare standards. Howell has implemented Perdue's poultry welfare requirements.

22.     Perdue has issued Management Guidelines to Howell for the conduct of farm operations. These guidelines cover a wide range of topics, including cleaning food pans, drinker lines, houses, and items like managing litter, applying insecticide, and cutting the grass. The Guidelines also address required twice daily walkdowns, specific temperature, lighting, and ventilation requirements.

23.     Perdue also issued "Biosecurity Never Evers and Dedicated Tos." These protocols centered around trying to prevent contamination of the flock from the outside world, especially from other flocks or individuals in contact with other flocks. The Dedicated Tos required proper cleaning and disinfection of all non-farm dedicated equipment prior to entering the chicken house and proper dress and disinfecting of individuals accessing the chicken house. The protocols also instructed farmers to allow only authorized visitors and to have all visitors comply with biosecurity requirements. Howell's most recent Farm Bio-security Risk Assessment Score was a 647, well above the Growing Area Average Risk Assessment score of 612 received by other farms.

24.      Before he was terminated, Perdue had not issued specific COVID-19 protocols for the poultry farmers like Howell.  On May 15, 2020, Perdue sent a letter to Howell informing him they intended to reduce flock placement density due to government regulations restricting business operations and travel and current poultry market conditions. In early 2020, as the COVID-19 pandemic spread into North Carolina, Perdue shared a video regarding company-wide safety issues in an email newsletter. The video pertained mostly to plant employees and gave no specific instruction to farmers regarding operations on-farm.

Complaint of Retaliation

8

25.     In 2016, Perdue released an "animal welfare policy," disclosing its alleged current practices and representing to undertake future planned improvements to meet growing customer and consumer demand for poultry raised to higher welfare standards. One facet of the policy was committing to doubling the rate of activity of Perdue's birds within three years. Perdue's policy put forward, as one option to achieve this goal, the transition to breeds of birds that grow slower, and thus are capable of more activity, because selective breeding for rapid growth can cause immobility and animal suffering, including leg deformities and heart attacks. In July 2017, Perdue signed on to the "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues." As a result, Perdue promised its customers it would meet the animal welfare criteria consumers desired and demanded, including raising and studying these slower-growing chickens and strengthening relationships with farmers.

## V.      **PROTECTED ACTIVITY**

26.     After being in business with Perdue Farms for some time, Howell began to recognize lapses of sanitation and health standards on the part of Perdue. He noted that Perdue was delivering poor quality feed and sickly chicks. He observed Respondent was careless and abusive with chickens, delivering chicks in filthy trays, failing to sanitize trailers and catch machines, and willfully dropping chickens on their heads during their weighing. He shared these and other concerns several times, first with Respondent and then with regulatory agencies, lawmakers, the media, and the public.

27.     In the mid- to late 2019 timeframe, Howell observed that he was having to cull uncharacteristically high numbers of sickly birds. On June 27, 2019, Howell recorded culling 148 birds in one house. He confirmed with other growers that they also were experiencing high cull volumes.

28. Beginning in November 2019, Howell observed that the scales—used to determine when the maximum number of birds had been put in an individual cage for transport—were not functioning properly. The dangerous effect was that catch crews did not know how many birds were in the transport cages, and some cages were thus overfilled. - creating potential insanitary conditions and threatening animal welfare. Howell reported these insanitary conditions and threats to animal welfare to Perdue through his Live Haul Performance & Service Score report in November 2019, and again in January 2020, March 2020, and June 2020.

29. Due to lack of redress, Howell began sharing his concerns with the media and, by extension, the public. On March 14, 2020, *The Guardian* reported on Howell's food and feed safety concerns, including his reports that Perdue was sending the farmers low-quality feed (including wet and moldy feed that endangered the health of the chickens) and that Perdue was sending farmers large numbers of sickly birds that had to be culled.

30. On April 24, 2020, Howell sent photos of the dirty trays in which Perdue was delivering chicks to Perdue's Director of Live Production Tim Little. Having received no response, on April 30, 2020, Howell escalated his concerns to USDA Resident Agent Supervisor Wayne Basford. Howell noted that Perdue had delivered chicks in dirty trays, contrary to the company's stated policies for biosecurity and sanitation. Howell also reported he was concerned that Perdue's use of dirty trays for his chicks, specifically, may have been retaliation for his reports of concerns.

31. On June 1, 2020, Howell reported sanitation issues with the catch machine. A catch machine uses rubber fingers on rotating drums to catch and move chickens into cages for loading onto a truck. Howell reported to Perdue via his Live Haul Performance & Service Score

report that Perdue's catch machine was dirty and housed a dead chicken from a prior catch. He reported that Perdue's trailers also were dirty. These violations of Perdue's stated policies for biosecurity and sanitation presented cross-contamination threats to his flocks.

32.     On June 27, 2020, Howell escalated his concern that Perdue was violating sanitation rules by delivering chicks in dirty, insanitary trays to Plant Manager Randy Brown. Howell also attached copies of the Live Haul Performance & Service Score reports recording his concerns about the contaminated trailer and catch machines. Brown told Howell that Brown would check with his Plant Manager and Live Haul Manager. However, Perdue did not respond further to Howell's concerns.

33.     On June 30, 2020, Howell informed his flock supervisor, Dean Shuttleworth, of his visitors and requested four sets of coveralls for the visitors, consistent with biosecurity protocols. By providing Howell with disposable coveralls at Howell's chicken houses, Shuttleworth necessarily was aware of Howell's visitors.

34.     Complainant decided to report Respondent's practices through other viable and effective reporting channels. Complainant knew that reporting the above concerns to Perdue through its vague internal channels was consistently futile given his past experiences.  He was also aware that USDA had not been involved in policing integrity within the poultry industry beyond safe growing practices that could impact post-slaughter meat safety.  USDA surveillance and involvement with marketing to consumers was limited to safe inspection certification, and he was unaware of any external reporting channels to the USDA or FDA to act on his reports about consumer misrepresentation regarding human growing practices.  The only viable alternative known to Complainant to protect public health, industry integrity and consumers was to resort to public channels by reporting to industry-specific NGOs and media, which in turn has the best

chance of attracting Congressional oversight. In furtherance of his efforts to oppose Respondent's practices, Howell agreed to meet with CCRW, share his concerns regarding animal welfare and public health, and collaborate to develop solutions. On or around June 22, 2020, Crystal Coast Waterkeeper Larry Baldwin had contacted Howell to request access to Howell's farm and chicken houses for a group of public health advocates. As a Waterkeeper and part of the Coastal Carolina Riverwatch (hereinafter CCRW), Baldwin works with communities, businesses, and governmental agencies to stop the negative impacts of the swine and poultry industry. Thus, determined to use this available NGO channel, on July 8, 2020, Howell hosted four public health advocates at the farm's chicken houses, including Waterkeeper Larry Baldwin, Lumber Riverkeeper Jefferson Currie II, Cape Fear Riverkeeper Kemp Burdette, and videographer for We Animals Media (WAM) Kelly Guerin. WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and organizations to use for animal welfare advocacy. Howell and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols.

35. During the July 8, 2020 tour of the chicken house, Guerin videotaped the flock, and Howell informed the advocates of his ongoing concerns—that large numbers of the birds he had been receiving from Respondent were arriving sick and unviable, that he had to undertake a high volume of culling, and that there were insanitary conditions of transport and weighing. He discussed Respondent's lack of responsiveness. Howell specifically identified two birds designated to be euthanized because they were injured and/or too small to reach food and water freely. He demonstrated the procedure of cervical dislocation (basically a decapitation of the chick by hand) as a means to cull chickens. Guerin asked if she could take home with her two

birds identified as "culls," who otherwise would not survive. Because chick mortality is a farmer-specific responsibility and not in violation of his contract with Respondent, Howell permitted her to take the chicks. An individual chick, even in perfect health, is valued at less than one dollar.

36.     On or around July 15, 2020, Baldwin asked for chicken house access for a second group of Waterkeepers and another film crew. Howell agreed and again contacted his flock supervisor to request disposable coveralls. His flock supervisor delivered the requested coveralls for the second set of public health advocates. On July 29, 2020, Baldwin, Currie, Haw Riverkeeper Emily Sutton, and three members of Lockwood Films visited Howell's chicken houses. Consistent with biosecurity protocols, all members of the group wore protective gear, either the coveralls provided by Perdue or unused Tyvek suits brought by the visitors. Howell and Simmons were both present, again, and ensured biosecurity protocols were followed. During this second visit, Howell reiterated his concerns that Perdue supplied him with large numbers of birds that were sick and unviable; that he had to undertake a high volume of culling; and that the chicken were subjected to insanitary conditions of transport and weighing.

37.     On July 17, 2020, We Animals Media posted a description of Guerin's visit to Howell's chicken houses to its Facebook page. The group noted that these chicken houses were usually inaccessible to anyone outside of the industry, but that they had been invited by the farmer to bring transparency to the poultry industry. Guerin reported observing a chick lying on the floor unresponsive and breathing heavily and another chick tinier than the others stumbling around with closed eyes and a beak encrusted with feces. Guerin described asking to rescue the two chicks, to which Howell agreed.  She detailed naming the lone surviving chick "Sweet Pea" and placing her with Piedmont Farm Animal Refuge.

38.     On July 30, 2020, We Animals Media published its footage of Howell's chicken houses in a documentary and a collateral written piece that exposed animal welfare and public health concerns associated with industrial poultry farming on its website. Howell expected that Perdue would review the video footage—and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's problematic animal husbandry practices. Howell also hoped and believed that the video's publication would prompt further investigation or other action by government officials. This video remains a key piece of advocacy material publicly available and maintained on We Animals Media's website: "Mass Culling: System Shutdowns and the Failures of Factory Farming" (available here: https://weanimalsmedia.org/2020/07/30/system-shutdowns-and-the-failures-of-factory-farming/).

39.     On August 4, 2020, Sentient Media published an article, "Despite Perdue's High Welfare Standards, Some Chickens Can't Survive 45 Days," which described Guerin's visit to Howell's chicken houses and some of Howell's concerns. The article noted that—despite Perdue's commitment to consumers in its 2016 animal welfare policy and 2017 "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues"—it was still growing sickly chickens unable to survive. Guerin reported her observations that Howell's chickens from Perdue were still crumbling under the burden of selective breeding; young chicks could take only a few steps before plopping down with their legs splayed behind them. Guerin reported that Howell had walked among the birds unable to stand and demonstrated the culling procedure. Guerin noted the culling by Howell was not an anomaly, but rather standard daily procedure that Perdue reminded the farmer to do, including in postings in his barn. Guerin reported Howell allowed her to try to rescue two dying chicks that Howell was otherwise going to euthanize under Perdue's

standards. She noted that Howell reported that Perdue retaliated against farmers who speak out, including by sending them birds who are sicker, smaller, or hatched too late.

## VI. <u>ADVERSE ACTIONS</u>

40. On August 18, 2020, with no prior warning to, inquiry of, or discussion with Howell, Respondent terminated Howell's 25-plus year relationship with Perdue. Perdue's stated cause for such action was the allegation that Howell "materially breached" his contractual obligations to Perdue over the "past several months" by "touring groups of visitors inside [his] poultry houses." Perdue claimed the presence of these visitors violated Perdue's Poultry Welfare and Bio-Security Programs and COVID-19 protocols. Perdue also claimed Howell "converted" Perdue's property without Perdue's consent.

## VII. <u>NEXUS/CONTRIBUTING FACTOR</u>

41. Howell reasonably believed his disclosures to the Respondent, public health advocates, and media crews were violations of the FFDCA/FSMA, as those disclosures pertained to the insanitary transport and storage conditions of chickens, welfare of live chickens for future consumption (i.e. "food") and/or the quality of animal feed, the subject matters over which FSMA has jurisdiction.

42. As noted above, Respondent was aware of Howell's protected disclosures. Howell's disclosures about insanitary conditions and threats to flock health, including as detailed *infra* at paragraphs 26-28 and 30-32, were made directly to Respondent. Howell's cooperation with and disclosures to the media and public health advocates about biosecurity, food safety, and feed quality (see *infra* paragraphs 29, 34-39) were publicly available via the internet, from *The Guardian* in March 2020, We The Animals in July 2020, and Sentient Media in August 2020. *The Guardian* also contacted Respondent directly for comment on its article.

43.     Respondent also was aware of Howell's involvement with media and public advocates because Howell informed his supervisor of the visits and Respondent supervisor delivered protective gear to Howell for the group.

44.     Perdue sent Howell the termination letter just two weeks after the most recent publication from the media members visiting Howell's farm. Respondent specifically referenced the advocate visitors in Howell's termination letter, claiming Howell was "touring groups of visitors." Respondent's claim that Howell "converted" Respondent's property reflects an acknowledgement that Respondent was aware of the media coverage regarding the two sickly chicks rescued from culling and Howell's reports of poor chicken health to the visitors.

45.     Respondent terminated Howell with no investigation, inquiry, or discussion with Howell. Respondent asserted that Howell committed a material breach of their contract by hosting a group of visitors at Howell's chicken houses. However, the Poultry Producer Agreement makes no reference to visitors. Respondent claimed Howell violated bio security protocols and COVID protocols, but Howell requested and received personal protective gear from Respondent for use with the visitors to meet bio security profiles. Further Howell did not receive COVID guidance from Respondent that was applicable to his farm. Respondent did not identify any biosecurity protocols or COVID protocols that Howell violated. Though Respondent had notice of the visits well in advance, Respondent did not invoke these objections to visitors at any point prior to the visits.

46.     Howell's protected activities were a contributing factor in the adverse action taken against him. Respondent's decision to terminate Howell was made in reprisal for his protected activity to Respondent and to the media and public.

47.     The foregoing facts demonstrate that Respondent terminated Howell's employment in violation of the Food Safety Modernization Act's employee protection provision, 21 U.S.C. § 399d.

## VIII.   CLAIM FOR RELIEF

48. 21 U.S.C. § 399d(a)(1) of the Food Safety Modernization Act created three types of statutorily protected channels for reporting and disclosing covered food safety and integrity issues: (1) an internal channel "to the employer"; (2) an external channel to any agency, department or instrumentality of "the Federal Government", which by definition includes Congress; and a second external channel to "the attorney general of a State"; and (3) a public channel to NGOs or the media who, in publishing a complainant's disclosures that may be received by one of the internal or external reporting channels, thereby function as "any person acting pursuant to a request of the employee" in "caus[ing] to be provided" said disclosures by Complainant.

49.  CCRW and the Guardian constituted such a protected public reporting channel, and both constituted a "person acting pursuant to a request of the employee".

50. Howell engaged in protected activity under 21 U.S.C. § 399d, the Food Safety Modernization Act's employee-protection provision when he reported insanitary conditions, lack of quality feed, and unhealthy flocks to Respondent supervisors and government regulators. He also engaged in protected activity when he used the described public reporting channel and facilitated access to, and provided information for, advocacy groups for the production and publication of video footage and news articles depicting the conditions of birds placed on his farm by Respondent and criticizing Respondent's practices. As noted above, Howell believed that the condition of the birds raised on his farms was the result of Respondent's practices and

conduct described above. He reasonably believed that in making his disclosures that he disclosed information relating to a violation, act or omission of the Respondent under the Food, Drug and Cosmetics Act, 21 U.S.C. 391 et seq., or an order, rule, regulation, standard, or ban thereunder (hereafter FDCA). Complainant reasonably believed that he was a covered employee under § 399d.

51. Under the FFDCA, "food" is defined as articles (and components thereof) used for food or drink for man or other animals. 21 U.S.C. § 321(f). Thus, Perdue is a covered entity for purposes of the whistleblower provision because it processes, packs, transports, distributes, receives, and holds live animals used for food. See 21 C.F.R. §§ 1.377 ("Food has the meaning given in section 201(f) of the act (21 U.S.C.321(f)). Examples of food include . . . live food animals."); 1.227 ("Examples of food include ... live food animals"), 1.276(b)(5)(ii) ("Examples of food include . . . live food animals."), 1.328 ("Examples of food include . . . live food animals."). Perdue is also a "covered entity" for purposes of the whistleblower provision if it manufactures, processes, packs, transports, distributes, receives, holds, and/or imports food or drink for live animals it is raising. 21 U.S.C. § 399d; 29 C.F.R. § 1987.101(d).

52. The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and Cosmetic Act, food is deemed to be adulterated if it has been "prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," 21 U.S.C. § 342(a)(4), or if it is transported or offered

for transport under conditions that are not in compliance with regulations relating to sanitation, 21 U.S.C. § 342(i).

53. Respondent had knowledge of Howell's protected activity in using the public channel described above, and in making his internal reports, and Howell's protected activity was a contributing factor in Respondent's decision to terminate Complainant. Respondent would not have taken those adverse actions regardless of Complainants protected activity.

54. The allegations of the foregoing paragraphs are incorporated by reference and demonstrate that Respondent violated the Food Safety Modernization Act employee protection provisions when it terminated Complainant.

## IX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Complainant respectfully requests the following relief:

A. reinstatement with the same status that Complainant would have had, but for the retaliation;

B. if reinstatement is not possible, front pay in lieu of reinstatement;

C. lost wages, bonuses, and additional payments, from the time period since Complainant's termination to present that Complainant would have received had he not been terminated;

D. compensation for equipment and farm value lost;

E. damages for pain, suffering, mental anguish, and injury to Complainant's career and reputation;

F. prejudgment interest on all compensatory damages at the federal rate of interest;

G. compensation for special damages, including litigation costs, expert witness fees, and reasonable attorney fees and expenses;

H. an injunction instructing Respondent not to retaliate or discriminate against Complainant in any manner for his protected activity Complainant in any manner for his protected activity under the Food Safety Modernization Act, or for pursuing this action;

I. an order that Respondent expunge Complainant's employment record of any reference to the exercise of his rights under the employee protection provision of the Food Safety Modernization Act and of any references to his termination; and

J. any and all additional relief that may be available from law or equity, including the costs of this action.

Dated this 6th  day of May 2022.

<div style="margin-left: 40%;">

Respectfully submitted,


s/Stephani L. Ayers
Gabrielle DeStefano
Staff Attorney
GOVERNMENT ACCOUNTABILITY
PROJECT
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-449-6038
Email: gabrielled@whistleblower.org

Eric Spengler, Esq.
SPENGLER & AGANS PLLC
352 N. Caswell Road
Charlotte, NC 28204
Tel. 704-910-5469
Fax: 704-730-7861
Email: eric@spengleraganslaw.com


Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

</div>

Filed this 6th day of May with:

Chief Administrative Law Judge
USDOL-Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, D.C. 20001-8002
Telephone: (202) 693-7300
Fax: (202) 693-7365
OALJ-Filings@dol.gov


And served on:

Counsel for Perdue
Clayton E. Bailey
cbailey@baileybrauer.com
Campbell Centre I
8350 N. Central Expy, Suite 650
Dallas, Texas 75206
Tel: (214) 360-7433
Fax: (214) 360-7435

s/Stephani L. Ayers
Stephani L. Ayers

22